UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,　　　　　Case No. 21-CR-20080

　　　Plaintiff,　　　　　　　　　　　　　　Stephanie Dawkins Davis
v.　　　　　　　　　　　　　　　　　　　United States District Judge

ANTHONY STONE,

　　　Defendant.
_____ /

## ORDER DENYING MOTION TO SUPPRESS (ECF No. 11)

### I.　　INTRODUCTION

Defendant, Anthony Stone, was charged in a one-count indictment with being a prohibited person in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) in relation to events that occurred on September 8, 2020.  (ECF No. 1). He has filed a motion to suppress evidence seized from the warrantless search of his vehicle which occurred during the traffic stop that led to his arrest, along with statements he made after his arrest.  (ECF No. 11).  On July 15, 2021, the court conducted an evidentiary hearing, by video conference, and allowed the parties to submit supplemental briefing after the hearing.  (ECF 18, 19, 20, 21).

Stone first objects to the Michigan State Police troopers having initiated the traffic stop based on his vehicle being uninsured, which was information they obtained after running his license plate number through a law enforcement data

base.  Stone posits that basing a traffic stop solely on the vehicle's lack of insurance is a constitutional overreach.  Additionally, Stone argues that while he gave consent for the troopers to search his vehicle, his consent was limited in that it confined the troopers to entering the trunk/cargo area through the rear hatch, and not through the rear seat, as they proceeded to do.

For the reasons set forth below, the court **DENIES** defendant's motion to suppress.

## II.    FACTUAL BACKGROUND

There is little dispute about the facts and sequence of events.  On the evening of September 8, 2020, Michigan State Police Troopers Chiros and Ager were on patrol in Flint when they observed a black Lincoln SUV exit the Economy Motel and head west on Corunna Road.  (ECF No. 19, PageID.74, at 17-22).  Chiros and Ager pulled their car around and ran the license plate through a Michigan Secretary of State database (SOS database).  (ECF No. 19, PageID.76-77).  The query showed the Lincoln was not insured (EIV=N).  (ECF No. 19, PageID.77-78).  Trooper Chiros has stopped more than a hundred cars for having no insurance, and in his experience, the insurance information in the SOS database has been accurate more than 90 to 95 percent of the time.  (ECF No. 19, PageID.78-79).  When the Lincoln SUV pulled into a Walmart parking lot, officers pulled behind it and turned on their emergency lights.  (ECF No. 19,

2

PageID.80, at 3-7). Trooper Chiros approached the driver's side of the vehicle, while Trooper Ager approached the passenger side. (Dash Camera Video, Gov. Ex 7b at 0:35).[1]

After briefly speaking with Stone, Trooper Chiros observed an open Tanqueray vodka bottle in the center console. (ECF No. 19, PageID.83 at 6-10; Photo of vodka bottle, Gov. Ex. 3). Trooper Chiros asked Stone to hand him the bottle. (Gov. Ex. 7b at 0:42). Stone complied and Trooper Chiros initially placed it on the roof of the vehicle. (ECF No. 19, PageID.78-79). It contained a small amount of alcohol in it. (Gov. Ex 7b at 0:48). Trooper Chiros asked Stone, "You guys aren't drinking that today, is that old?" and Stone replied that it was "old." (Gov. Ex 7b at 0:50).

Trooper Chiros continued to speak with Stone and asked him if the vehicle had insurance. (Gov. Ex 7b at 0:55). Stone replied that it did. (Gov. Ex 7b at 0:58). Chiros then asked Stone to find the proof of insurance. (Gov. Ex 7b at 1:00). Stone was unable to provide insurance information. (ECF No. 19, PageID.86 at 6-8). Stone also provided Chiros a state ID card rather than a driver's license. (Gov. Ex 7b at 1:20). Meanwhile Trooper Ager spoke to the front passenger, who was later identified as Sarah Pinion. (ECF No. 19, PageID.156;

---

[1] Government Exhibits 1-6, 7-A, 7-B, 7-C, and 8-9 were admitted into evidence at the suppression hearing.

3

ECF No. 19, PageID.97). Pinion initially identified herself as "Amber" and told Trooper Ager that she did not have identification. (ECF No. 19, PageID.96; Gov. Ex. 7b at 1:14). When Trooper Ager asked her last name, she refused to provide it. (Gov. Ex. 7b at 1:30). Pinion also had difficulty lowering the passenger-side window. (Hrg. Tr., ECF No. 19, PageID.156). While Trooper Ager spoke with Pinion, Trooper Chiros told Stone to "hop out of the car." (Gov. Ex. 7b at 1:38). Stone complied, and with Stone's permission, Trooper Chiros patted him down for weapons. (Gov. Ex. 7b at 1:45; Gov. Ex. 7c at 1:45-1:55). Trooper Chiros continued to speak with Stone. (Gov. Ex. 7c at 1:55). Trooper Ager, meanwhile, continued to speak with Pinion who continued to refuse to provide her last name. (Gov. Ex. 7b at 1:30-2:30). Trooper Chiros told Stone, "she (referring to Pinion) looks like she's on something." (Gov. Ex. 7b at 2:50).

Trooper Chiros then asked Stone, "There is nothing illegal in the car, nothing like that." Stone replied "No." (Gov. Ex. 7b at 3:00-3:05). Trooper Chiros asked Stone, "Is it okay if we search the car." Stone said, "yeah." Trooper Chiros confirmed, "Yeah?" and Stone again replied "Yeah." (Gov. Ex. 7b at 3:05-3:08). Trooper Chiros directed Stone to stand in front of the patrol vehicle. (Gov. Ex. 7b at 3:09). Trooper Chiros told Trooper Ager to have Pinion get out of the vehicle. (Gov. Ex. 7b at 3:12). As soon as Pinion stepped out of the car, Trooper Chiros directed her to the front of his patrol vehicle where he was able to look at

4

her face and eyes. (Gov. Ex. 7b at 3:30). Trooper Chiros observed that Pinion's speech was slurred and she was extremely restless. (ECF No. 19, PageID.90). Trooper Chiros told her, "So obviously, you've taken some sort of opiate or heroin." (Gov. Ex. 7b at 3:34-3:36). After a short conversation, Pinion admitted that she had taken drugs— "I did a little bit of ice." (Gov. Ex. 7b at 3:44-3:51). Trooper Chiros spoke with Pinion and asked her if she had anything in the car. (Gov. Ex. 7b at 4:53). She denied having anything and Trooper Chiros turned to Trooper Ager, in the presence of both Pinion and Stone and said, "he said we can search the car, so go ahead." (Gov. Ex. 7b at 4:55-5:01). At that point, Trooper Ager began searching the car as Stone looked on. (Gov. Ex. 7b at 5:03).

Trooper Chiros continued to speak with Stone and Pinion as Trooper Ager searched the car. (Gov. Ex. 7b at 5:01-5:58). During the conversation, Pinion told Trooper Chiros her name was "Amber Daugherty." (Gov. Ex. 7b at 5:55-5:59). Trooper Chiros searched the name in his vehicle computer, and did not find any information. (Hrg. Tr., ECF No. 19, PageID.96). As Trooper Ager searched the car, Trooper Chiros also told Stone that the computer showed that the vehicle was uninsured, which was why Stone was pulled over. (Gov. Ex. 7b at 6:47-6:50). While Trooper Chiros tried to determine Pinion's identity, Stone smoked a cigarette and watched as Trooper Ager searched the car. (Gov. Ex. 7b at 6:40-10:10). At one point, Stone told Trooper Ager that he could access the trunk of the

vehicle from the tailgate. (ECF No. 19, PageID.167). According to Trooper Ager, Stone did not tell him that he was required to search it from the rear hatch. *Id*.

Trooper Ager eventually found a backpack in the trunk and asked Stone, "is that your bag?" (Gov. Ex. 7b at 10:07). Stone replied, "No." (Gov. Ex. 7b at 10:10). Trooper Ager felt the backpack and felt what seemed to be a magazine inserted into a handgun. (ECF No. 19, PageID.157). Trooper Ager unzipped the backpack and found a black handgun with a black extended magazine inserted into it. *Id*. Stone then moved away from the front of the patrol vehicle and Trooper Chiros said, "Mr. Stone stay right here for me." (Gov. Ex. 7b at 10:33). Stone then ran away from the scene. Trooper Chiros yelled, "Hey!" and Trooper Ager ran after him. (Gov. Ex. 7b at 10:37; ECF No. 19, PageID.157). Trooper Ager eventually caught up with Stone as Stone was going over a fence. (ECF No. 19, PageID.158). They struggled and Trooper Ager deployed his taser. (ECF No. 19, PageID.158-60). Eventually Trooper Ager placed Stone under arrest. (ECF No. 19, PageID.160). Meanwhile, Trooper Chiros searched the rest of Stone's vehicle and the backpack. (ECF No. 19, PageID.99). In the backpack, Trooper Chiros seized a 9mm caliber handgun which was loaded with an extended magazine. (ECF No. 19, PageID.100-01).

After he was arrested, Stone said he felt like he was out of breath and police took him to Hurley Hospital in Flint. (ECF No. 19, PageID.145). While Stone

was at the hospital, officers read him his Miranda rights, which he waived. (ECF No. 19, PageID.116, 145). As Trooper Chiros read Stone his rights, Stone appeared lucid, not distracted or loopy, and able to carry-on a conversation with ease. (ECF No. 19, PageID.145). The troopers then surreptitiously recorded an interview with Stone. During the interview, Stone made several statements about how he obtained the firearm. (ECF No. 14, PageID.47). By this motion, Stone seeks to suppress those statements also. (ECF No. 11, PageID.39).

### III. ANALYSIS

As the Court of Appeals recently explained, the Fourth Amendment permits law enforcement officers to undertake "brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Scheckles*, 996 F.3d 330, 343 (6th Cir. 2021) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). Officers may engage in these "*Terry* stops" if they have a "reasonable suspicion" of criminal activity. *Id*. (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). This reasonable-suspicion test turns on the same totality of the circumstances that governs the probable cause inquiry. *Id*. (citing *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). However, reasonable suspicion requires less than the "probability or substantial chance of criminal activity" necessary for probable cause. *Id*. (citing *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018)). Instead, officers only need "a

particularized and objective basis for suspecting the particular person stopped of criminal activity." *Id*. (quoting *Kansas v. Glover*, 140 S. Ct. 1183, 1187 (2020) (citation omitted). Given that probable cause itself "is not a high bar," it follows that reasonable suspicion is even less so. *Id*. (quoting *Wesby*, 138 S. Ct. at 586 (citation omitted) and citing *United States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014)).

Stone argues that the stop was not justified because the troopers did not have a reasonable suspicion of criminal activity sufficient to justify following Stone's vehicle and running his license plate through the SOS database. As an initial matter, under Michigan law, operating a motor vehicle without insurance is a criminal misdemeanor offense. Mich. Comp. Laws § 500.3102. Therefore, the question becomes whether the troopers had a reasonable, articulable reason to believe that Stone was driving without insurance *when they stopped him* – not when they ran his tag. Indeed, Stone does not offer any authority for the proposition that police offers may not run a license plate through the SOS database without some independent justification for doing so, that would itself meet the reasonable suspicion standard.[2] Moreover, despite Stone's argument to the

---

[2] Stone's argument suggests that failure to insure a vehicle is not an "operational" or "safety" issue. But, Stone offers no authority suggesting that reasonable suspicion for a traffic stop must be related only to vehicle "operational" or "safety" issues. Nor does Stone explain why lack of vehicle insurance – the purpose of which is to maintain security for the payment of personal and property protection insurance for the benefit of all vehicle occupants in the State of

8

contrary, the facts here are similar those in *United States v. Lawrence*, 425 F.Supp.3d 828 (E.D. Mich. 2019) as it relates to using information about insurance status obtained from a law enforcement database to support reasonable suspicion. In *Lawrence*, Michigan State Police troopers were assigned to the City of Saginaw and were tasked with "proactively stopping cars" pursuant to the Secure City Partnership between the local police forces and the state police in order to stop violent crime, but they would only stop vehicles if there was a "legitimate question about the legality of specific behavior." In applying that standard, the police officers ran the license plate of a car in which the defendant was the front-seat passenger and found that the owner of the vehicle had an outstanding warrant for her arrest, the owner did not have a license, and there was no valid insurance on the vehicle. When the officers approached the vehicle, the driver explained that the vehicle belonged to his girlfriend. He provided proof of insurance, which was later determined to have been cancelled. Officers asked the driver for permission to search the vehicle, which was granted (although the driver later disputed giving consent), and the passenger was asked to exit the vehicle. The passenger admitted during questioning that he had a gun in his waistband. The gun was seized and the passenger was charged with being a felon in possession of a firearm. The

---

Michigan – would not implicate a safety or operational issue. *See* Mich. Comp. Laws § 500.3101.

passenger/defendant later argued that the officers did not have probable cause of a traffic violation or a reasonable belief that criminal activity may be afoot when they initially stopped the car because the owner of the vehicle was not present. The troopers did not mention the lack of insurance to the driver when they pulled him over and the driver produced a proof of insurance; accordingly, the defendant asserted that the officers did not observe a suspected traffic violation and they had no probable cause to stop the vehicle.

The court concluded that even if there was no probable cause to believe the driver was operating the vehicle without insurance, there was, without question, at least a reasonable suspicion that it was uninsured. Accordingly, the court found:

> Because knowingly driving a vehicle without insurance is a misdemeanor, [Mich. Comp. Laws § 500.3102] the police officers had reasonable suspicion that the vehicle was being driven without insurance and can legally initiate a traffic stop. Indeed, if LEIN shows there is no insurance coverage on the vehicle, police officers can impound the vehicle because it cannot be legally driven. *Hastert v. Mercer*, 2015 WL 6394788 at \*1-2 (W.D. Mich. Oct. 22, 2015).

*Id*. at 832-33. Like the officers in *Lawrence*, Troopers Chiros and Ager had information from the SOS database that Stone's vehicle was uninsured. This information was sufficient for them to reasonably suspect that Stone's vehicle was being driven without insurance, which is all that is needed to justify an investigatory traffic stop.

10

Stone makes much out of the fact that the SOS database is only 90-95% accurate. The database's high degree of accuracy would seem to work against rather than support Stone's argument. As a practical matter, "probable cause does not require absolute certainty." *United States v. Lewis*, 615 Fed. Appx. 332, 337 (6th Cir. 2015). It does not even require a showing that the officer's belief is "correct or more likely true than false." *Texas v. Brown*, 460 U.S. 730, 742 (1983). And, as discussed above, the reasonable suspicion standard is even less onerous than the probable cause standard. *Prado Navarette v. California*, 572 U.S. 393, 397 (2014) (The level of suspicion that justifies an investigative stop, reasonable suspicion, "is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause."). Thus, the troopers' reliance on information from a state database that has been measured to be at least 90% accurate in identifying vehicles that lack insurance coverage would seem to easily raise a reasonable suspicion of a violation of state law. Indeed, several decisions in this district have found that police officers are entitled to rely on information in law enforcement databases to conduct an arrest, even if it later turns out that information was inaccurate. *Lawrence*, 425 F.Supp.3d at 833 (citing *Scott v. City of Port Huron*, 2017 WL 877317 at *8 (E.D. Mich. March 6, 2017) (Even if all the officer had relied on was the information from LEIN, he could have reasonably believed he had probable cause to effectuate the arrest); *Taggart v.*

11

*Macomb County*, 587 F. Supp. 1080, 1081-1082 (E.D. Mich. 1982) (Officers had the right to rely on information in LEIN and therefore had a reasonable basis to arrest the plaintiff); *Shumate v. Cleveland*, 2010 WL 2813334 at *4 (E.D. Mich. July 14, 2010) (Officer are entitled to rely on warrants appearing in LEIN when making an arrest). The 90-95% accuracy rate of the SOS database, at a minimum, satisfies the reasonable suspicion standard, which is all that is required here to justify the traffic stop.

In his supplemental brief, Stone at least suggests that more than reasonable suspicion was required to justify the troopers' actions here because they did not merely stop him on the side of the road, but additionally positioned their vehicle behind his while he was parked in a parking spot, leaving "no way out." (ECF No. 20, PageID.186). Stone adds that he could not move without the troopers' permission and the troopers' actions constituted an "intentional application of force." *Id*. As such, though not entirely clear, Stone appears to argue that he was arrested at a point when the officers lacked probable cause. The first question is whether Stone was arrested when troopers blocked his vehicle and asked him to exit the vehicle and stand near the front of their patrol car. As discussed in greater detail in relation to the troopers' request for consent to search the vehicle, *infra*, the troopers' relatively brief investigatory stop did not turn into an arrest merely because of the positioning of the patrol car and Stone's brief detention while

officers investigated the information they had obtained, namely the SOS insurance data and the observation of the open alcohol in the vehicle. *See e.g.*, *United States v. Smith*, 2019 WL 848050, *14 (E.D. Ky. Feb. 4, 2019) (Under the totality of the circumstances, defendant was not in custody for purposes of *Miranda*, during the time leading up to the search of his car, even though the officers' patrol car blocked any egress from the property.). Even if he were deemed arrested, Stone's argument that the officers lacked probable cause is problematic. By the time the troopers asked him to exit the vehicle, they not only knew the SOS database information but also that there was an open container of alcohol sitting in their plain view. (ECF No. 19, PageID.83 at 6-10; Gov. Ex. 3; Gov. Ex. 7b). At this point, the troopers had probable cause to arrest defendant for possessing an open container of alcohol in his car in violation of Mich. Comp. Laws § 257.624a and thus, would have inevitably discovered the gun in Stone's vehicle. *See e.g.*, *United States v. Wilson*, 806 Fed. Appx. 450, *454 (6th Cir. 2020) (Even if defendant did not consent to the search of his person, the weapon would have been inevitably discovered because the officers had probable cause to arrest defendant for operating a vehicle while under the influence of alcohol and for possessing an open container of alcohol in his vehicle, in violation of Michigan law).[3]

---

[3] The government also argues that the troopers had independently established probable cause to search the vehicle based on observing the vehicle depart from a location of known drug activity and a visibly, drug-impaired passenger who initially refused to give her full and correct

Stone next argues that he did not give consent for the officers to search the vehicle through the rear doors of the vehicle – only through the rear hatch. If a police officer receives consent for the search, "a warrantless search does not offend the Constitution." *United States v. Moon*, 513 F.3d 527, 537 (6th Cir. 2008). Consent "must be voluntary and freely given." This means consent is "unequivocal, specific and intelligently given, uncontaminated by any duress or coercion." *Moon*, 513 F.3d at 527 (citing *United States v. McCaleb*, 552 F.2d 717, 721 (6th Cir. 1977)). Consent to search "is a question of fact to be determined from the totality of all the circumstances." *Moon*, 513 F.3d at 537 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)). Importantly, Stone does not deny that he gave consent altogether. Instead, he maintains that he requested the troopers search the trunk compartment through the rear hatch – a claim that the court interprets to be a suggestion that his consent was or became equivocal. (ECF No. 11, PageID.36-37). However, the evidence does not bear this out. Trooper Ager testified that Stone did not tell him that he was required to search the vehicle from the rear hatch (ECF No. 19, PageID.167); Trooper Chiros testified that Stone never requested that Ager stop searching the vehicle (ECF No. 19, PageID.36); and nothing in the video of the search itself demonstrates to the court that Stone

---

name and admitted to using "ice" before the search was conducted. However, because the court has concluded that Stone gave his voluntary and unequivocal consent to search the vehicle, the court need not to reach the question.

14

revoked or limited his consent in any way. (Govt. Exs. 7b, 7c). Indeed, Stone lodged no objections while Trooper Ager searched the vehicle through the rear doors and he can be seen on video calmly waiting throughout the process until the bag with the firearm was found. *Id*. Therefore, the court concludes that Stone's consent to the search was neither revoked nor limited in any fashion.

Additionally, as discussed in *Lawrence*, under Michigan law, the officers could have impounded the car because of the lack of insurance. *Id*. at 832-833. In this case, the impoundment of the vehicle based on lack of insurance would have inevitably led to the discovery of the fireman. Indeed, Trooper Chiros here explained that because of the lack of insurance, they would have conducted an inventory search before having Stone's vehicle towed. (ECF No. 19, PageID.113-114). Thus, regardless of consent to search, the troopers would have inevitably discovered the bag with the firearm.

Stone also argues that, because he was in custody during the traffic stop, he should have been given *Miranda* warnings before he was asked to consent to the search and the failure to do so voided the consent. The Fifth Amendment provides that an individual may not be "compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V. "In order to safeguard that right, law-enforcement officers must inform a suspect of his rights under the Fifth Amendment—including his right to remain silent in response to the officers'

15

questions, and his right to the presence of an attorney—before conducting a custodial interrogation." *United States v. Jackson*, 2021 WL 530993 (E.D. Ky. Feb. 12, 2021) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). A suspect is in custody if he is subjected to "the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id*. (quoting *Howes v. Fields*, 565 U.S. 499, 509 (2012)). Here, just as in *Jackson*, Stone did not have unrestrained freedom to move about, nor was he free to leave, because he was subject to a traffic stop. However, while a traffic stop does restrict a driver's freedom of movement, the Supreme Court has held that an individual briefly detained for a routine traffic stop "is not 'in custody' for the purposes of *Miranda*." *Id*. (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984). The Supreme Court has further held that "the temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop does not constitute *Miranda* custody." *Id*. (quoting *United States v. Cantie*, 2021 WL 79805, at *4 (6th Cir. Jan. 11, 2021) (quoting *Maryland v. Shatzer*, 559 U.S. 98, 113 (2010)). Yet, an investigatory detention can evolve into a custodial interrogation, which would require that the seizure be supported by probable cause, not mere reasonable suspicion. *Id*. (citing *United States v. Knox*, 839 F.2d 285, 297 (6th Cir. 1988) (Jones, J., concurring)).

The court concludes that Stone was not in custody for purposes of *Miranda* while his vehicle was searched. To the extent that Stone's argument suggests that

16

all traffic stops where the vehicle is boxed in by a patrol car render a driver in custody for purposes of *Miranda*, any such argument is belied by *United States v. Smith*, *supra*. Further, Stone has not pointed to any other facts suggesting that this ordinary traffic stop evolved into a custodial interrogation such that *Miranda* warnings were required. Stone was asked a few questions during the search and the conversation remained cordial. As observed in *Jackson*, while the defendant was not free to leave because of the ongoing traffic stop, he was not handcuffed or physically restrained in any way during the questioning. *Id.* at *5 (citing *United States v. Abdi*, 827 Fed. Appx. 499, 506 (6th Cir. 2020) ("Not all restraints on freedom of movement amount to custody for purposes of *Miranda*.") (quoting *Howes*, 565 U.S. at 509)). Here, Stone remained unrestrained throughout the entire traffic stop. And, like the circumstances in *Jackson*, only two officers were present and they did not display, draw, or point their weapons during the traffic stop. *Id*. In *Jackson*, the actual questioning lasted only five minutes, and was only as long as the time it took to inquire about the firearm, ask about active arrests, while the officer searched the vehicle and completed the traffic stop. Such questioning was neither hostile nor prolonged. *Id*. Here, the video shows Stone, uncuffed and unrestrained, calmly standing at the front of the patrol car, smoking a cigarette, while engaging in occasional, cordial conversation with the troopers, including being asked if the bag with the gun belonged to him and if the car belonged to him,

17

before fleeing. (Govt. Exs. 7b, 7c). The video of the stop reveals that only about ten minutes passed between the troopers' initiation of the stop and Stone's flight from the scene. *Id.* Nothing about the nature of the questioning or the length of the traffic stop suggests Stone's restrained movement was the result of anything other than an ordinary traffic stop. Again, the mere fact that Stone's movement was restrained does not transform this traffic stop into a custodial interrogation. Accordingly, the court concludes that Stone was not in custody when the troopers sought consent to search the vehicle, for purposes of *Miranda*, and rejects Stone's argument to the contrary.

Importantly, Stone's argument does not suggest that he believes that there was a stand-alone violation of *Miranda* based on the statements taken at Hurley Hospital, presumably because *Miranda* warnings were plainly given at that time. (ECF No. 19, PagedID.145; Govt. Ex. 9). That is, Stone's *Miranda* argument is based solely on the claim that all evidence flowing from the traffic stop must be suppressed as fruit of the poisonous tree because he was not given a *Miranda* warning before being asked to consent to the search. As discussed above, the court has rejected this argument, concluding that Stone was not in custody prior the search, that he consented to the search, that the troopers had probable cause to conduct the search based on the open alcohol container, and that the troopers would have inevitably discovered the gun when they conducted an inventory

search before having the vehicle towed based on the lack of proof of insurance. Accordingly, there is no basis to suppress any evidence as fruit of the poisonous tree.

## IV. CONCLUSION

For the reasons set forth above, the court **DENIES** defendant's motion to suppress.

**IT IS SO ORDERED**.

Date: September 17, 2021              s/Stephanie Dawkins Davis
                                     Stephanie Dawkins Davis
                                     United States District Judge